## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## (SOUTHERN DIVISION)

_____

| | |
|---|---|
| **BRUCE ALLEMAN and PATRICIA** ) | |
| **ALLEMAN, Individually and on behalf** ) | |
| **of all others similarly situated** ) | **CIV. NO. _____** |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **PARK WEST GALLERIES, INC., d/b/a** ) | |
| **PARK WEST GALLERY, PWG** ) | |
| **FLORIDA, INC., FINE ART SALES,** ) | |
| **INC., VISTA FINE ART, LLC d/b/a PARK** ) | |
| **WEST AT SEA, ALBERT SCAGLIONE,** ) | |
| **ROYAL CARIBBEAN CRUISES LTD.,** ) | |
| **and JOHN DOES 1-100.** ) | |
| ) | |
| **Defendants.** ) | |

_____ )

## CLASS ACTION COMPLAINT

Plaintiffs, Bruce Alleman and Patricia Alleman (together "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), file this class action against Defendants: Park West Galleries, Inc. d/b/a Park West Gallery, PWG Florida, Inc., Fine Art Sales, Inc., Vista Fine Art, LLC d/b/a Park West at Sea (together "Park West"), Albert Scaglione ("Scaglione"), Royal Caribbean Cruises Ltd. ("Royal Caribbean"), and John Does 1-100 (together "Defendants"). Plaintiffs' allegations are based upon personal knowledge when pertaining to themselves and upon information and belief, based on the investigation and research of counsel and publicly available materials, as to all other facts alleged in the Complaint.

## NATURE OF THE ACTION

1.      This is an action for damages brought by Plaintiffs on behalf of a nationwide class of purchasers of artwork at shipboard art auctions conducted by Park West during leisure cruises on ships owned or operated by Royal Caribbean.  Art auctions at sea are a featured recreational event on cruises departing from the United States, ostensibly offered by cruise lines as an exciting and fun activity.  Because of the illegal actions of Defendants as described in this Complaint, Plaintiffs and the Class suffered losses and injury through the operation of the Art Auction Enterprise (defined below) when they purchased works of "art" at these auctions.  The "art" purchased was *not* as it was represented to be by Defendants.

2.      For at least the past ten (10) years, and continuing into the present, Park West planned, operated and continues to operate a fraudulent scheme to sell artwork at shipboard auctions on Royal Caribbean cruises, representing at each of the auctions on all of the cruises that the artwork is a "good investment," and will, immediately upon disembarking, appraise for "many times" the purchase price.  In fact, the artwork sold at the shipboard auctions is low-value or worthless, often mechanical reproductions or otherwise misrepresented in kind or quality by Park West, and is sold at inflated prices.

3.      Park West and Scaglione were assisted and facilitated by Royal Caribbean in accomplishing the goal of the Art Auction Enterprise to sell millions of dollars worth of artwork misrepresented to be a "good investment" and to sell phony Appraisals supporting the value of the artwork for the profit of Defendants.  Park West, Royal Caribbean and Scaglione earned millions of dollars from the operation of this illegal scheme.

2

4.      Royal Caribbean voluntarily and knowingly joined and conspired with Park West to feature the Park West art auctions on its cruises.

5.      Defendants' scheme as alleged in this Complaint violates the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961, *et seq*., and the state common and statutory laws entitling Plaintiffs and the Class to damages.

## THE PARTIES

**Plaintiffs**:

6.      Plaintiffs Bruce Alleman and Patricia Alleman (the "Allemans"), husband and wife, are citizens and residents of Waukegan, Illinois.  The Allemans purchased artwork in 2005 at a Park West shipboard auction on a Royal Caribbean cruise to the Caribbean aboard *The Enchantment of the Seas*.

7.      The Allemans are not sophisticated purchasers of art and attended the Park West auction as a recreational activity while cruising.  They purchased the artwork because it was represented by the auctioneer to be a "good investment" that would appraise for "many times" the hammer price (last bid price) immediately upon disembarking from the ship.

8.      The Allemans also purchased Appraisals for the artwork while on board the ship, which arrived in the mail and were signed by Scaglione.

9.      The artwork purchased by the Allemans is not what Park West represented it to be.  It is not a good investment, not worth what Plaintiffs paid for it, and the Appraisals from Park West/Scaglione are phony.

**Defendants:**

   A.      **Park West**

   10.      Defendant Park West Galleries, Inc. d/b/a Park West Gallery ("PWG") is a corporation organized under the laws of Michigan with its principal place of business and headquarters at 29469 Northwestern, Southfield, Michigan 49034.  PWG designed, operated and conspired with Scaglione and Royal Caribbean to operate the fraudulent scheme described in this Complaint.

   11.      PWG, on the Park West Gallery website, bills itself as the largest single operator of art auctions in the United States.  PWG sells approximately 300,000 pieces annually with $300 million in annual sales.  One-half of PWG's auction sales occur at shipboard auctions conducted during leisure cruises on the most famous cruise lines departing from the United States, including Royal Caribbean.  PWG has an exclusive contract to conduct art auctions on Royal Caribbean cruises.

   a.      PWG has approximately 180 employees in Southfield, Michigan and operates its exhibition galleries, executive offices, staff functions, art storage facilities, research, framing department and customer service departments from that location.

   b.      Upon information and belief, PWG maintains its business records in Southfield, Michigan.  These business records include an "End of Cruise Report," created and maintained by Park West, for each cruise on which an auction was conducted detailing:  the ship's itinerary, the date and venue of the auction, start and stop time, attendance, revenue from

sales, including buyer's premium, appraisals sold, and the customer's method of payment, including payment on the ship's bill.[1]

        c.    PWG has sold artwork, either itself or through affiliates it owns and controls, at shipboard auctions on the Royal Caribbean ships for at least the past ten (10) years. Park West pays Royal Caribbean a fee for renting the venues used to display the artwork and to hold the auctions on board the ship. It also pays Royal Caribbean all fees associated with conducting the auction, a fixed fee as a concessionaire and a percentage of the auction sales revenue for each voyage.

        d.    PWG prepares and distributes the phony Appraisals that are sold to successful bidders like Plaintiffs and the Class at the shipboard auctions.  These Appraisals are paid for separately from the price of the artwork and, like the artwork, can be paid for by a purchaser by adding the price of the artwork or Appraisal to the ship's bill or separately by credit card.

        e.    PWG is not a publicly held corporation.  Complete information about the corporate structure of PWG, including the nature of its affiliations with other Park West related or non-related entities, is not available to Plaintiffs and is under the exclusive control of Scaglione and Park West.

        f.    PWG controls Defendants PWG Florida, Inc., Fine Art Sales, Inc., Vista Fine Art LLC and John Does 1-50.

---

[1]    The ship's bill will include any items purchased by the cruiser that were not included in the price of the ticket.

g.      PWG designed and operated the Art Auction Enterprise and conspired with Royal Caribbean and Scaglione to operate the Art Auction Enterprise through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), as described in this Complaint.

12.     Defendant PWG Florida, Inc. ("PWG FL"), an affiliate of PWG, is incorporated in Delaware with its principal place of business in Miami Lakes, Florida.  PWG FL is controlled by Scaglione and PWG and participated with PWG in the operation of the fraudulent scheme and conspiracy alleged in this Complaint.

a.      PWG FL has approximately 207 employees in Florida.  PWG FL distributes artwork sold at the Park West shipboard auctions from its Florida location.  PWG employees travel frequently to PWG FL to conduct Park West's business.

b.      PWG FL is not a publicly held corporation.  Information about PWG FL, its corporate structure and affiliations with related Park-West entities, the John Does and Royal Caribbean is under the exclusive control of Scaglione, PWG or PWG FL.

c.      PWG FL participated with PWG and Scaglione in the fraudulent scheme to violate RICO, 18 U.S.C. § 1962(c), described in this Complaint and conspired with PWG, Scaglione and Royal Caribbean to violate RICO, 18 U.S.C. § 1962(c).

13.     Defendant Vista Art, LLC ("Vista") is a Delaware limited liability company with its principal place of business located in Southfield, Michigan.

a.      Vista, doing business as Park West at Sea ("PWS"), is an affiliate of PWG and participated in the operation of the fraudulent scheme and conspiracy described in this Complaint.  PWS conspired with Park West, Scaglione and Royal Caribbean to violate RICO, 18 U.S.C. § 1962(c).

6

c.      PWS sells artwork at shipboard auctions on ships operated by Royal Caribbean *always* while the cruise ships are in international waters and has done so for the past ten (10) years.

d.      PWS is controlled by Defendant Albert Scaglione, who is its sole member and a principal of PWG.  Vista/PWS is not a public company.  Information about the corporate structure of PWS and its affiliations with other Park West and non-Park West persons or entities is not publicly available and is under the exclusive control of PWG, PWS and Scaglione.

14.      Defendant Fine Art Sales, Inc. ("FASI") is a Delaware corporation with offices in the same facility as PWG in Southfield, Michigan.  FASI sells artwork aboard cruise ships, including the ships of Royal Caribbean.

a.      FASI is owned or controlled by PWG and Albert Scaglione.  FASI is not a publicly held corporation.  Information about FASI, its corporate structure and affiliations with related and non-related Park West persons or entities is under the exclusive control of FASI, Scaglione or Park West.

b.      FASI participated with PWG and Scaglione in the fraudulent scheme described in this Complaint and conspired with PWG, Scaglione and Royal Caribbean to violate RICO, 18 U.S.C. § 1962(c).

15.      Defendant Albert Scaglione ("Scaglione") is a citizen and resident of Michigan. Scaglione is the prime architect of the fraud and conspiracy to operate the Art Auction Enterprise described in this Complaint.  Scaglione is the founder, president and chief executive officer of PWG, having held the position of CEO for forty (40) years.  Scaglione is in charge of the day-to-

day operations of PWG and Park West and personally earned millions of dollars from the sale of artwork and Appraisals on Royal Caribbean cruise ships.

16.      Scaglione signed the Appraisals at issue in this Complaint.

17.      Scaglione, as an individual, is the managing member of the single member entity Vista, the Park West affiliate that does business as PWS.

18.      Scaglione controls PWG, PWG FL, Vista and PWS.

19.      Defendants John Does 1-50 are the affiliated or non-affiliated persons or entities of  Park West that directly or indirectly employ the auctioneers (or who are the auctioneers) that conducted the shipboard art auctions on the Royal Caribbean cruises and sold artwork to Plaintiffs and the Class.  John Does 1-50 are under the control of Park West and Scaglione.  Park West furnishes each auctioneer with a "Policy and Procedure Manual" prescribing techniques and policies to employ while conducting the shipboard auctions and conducts a training program for auctioneer "trainees."  In litigation throughout the United States, Park West has maintained the legal position that the auctioneers are "independent contractors."

20.      Park West and John Does 1-50 are referred to together in this Complaint as "Park West."

B.      **Royal Caribbean**

21.      Defendant Royal Caribbean Cruises Ltd. ("Royal Caribbean") is a Liberian corporation with its principal place of business at 1050 Caribbean Way, Miami, Florida 33132.

a.      Royal Caribbean directly or indirectly owns and operates cruise ships that depart regularly from all major port cities in the United States.  Royal Caribbean is the world's second largest cruise ship company, operating 37 ships and calling on 425 destinations.

8

b.      In 2008, Royal Caribbean had revenues of approximately $1.4 billion, with 27% of that revenue coming from on board "revenue accounts" or concessionaires like Park West.

c.      Royal Caribbean conspired with Park West, Scaglione and John Does 51-100 to operate the fraudulent scheme to violate RICO, 18 U.S.C. § 1962(c), as described in this Complaint.

22.      Defendants John Does 51-100 are affiliated or non-affiliated persons or entities that participated with Royal Caribbean in the illegal acts described in the Complaint.

23.      Royal Caribbean and John Does 51-100 are referred to in this Complaint as "Royal Caribbean."

## JURISDICTION

24.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1332, the Class Action Fairness Act of 2005.  The amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs, and members of the putative class number in excess of one hundred (100) and reside in states different from the Defendants. This Court has supplemental jurisdiction over the Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

25.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1).  Park West and Scaglione reside in this district and Royal Caribbean does business and is present in this district through its on-going business relationships with Park West and with the citizens of this State.  A substantial part of the events alleged in this Complaint giving rise to Plaintiffs' claims occurred in and were directed from this district.

## FACTUAL ALLEGATIONS

**Park West:**

26.     Park West styles itself as the world's largest art dealer, selling over 300,000 pieces of artwork a year, garnering revenues in 2007 in excess of $300 million.  Half of this revenue was generated by Park West shipboard auctions conducted on the world's most famous and popular cruise ships, including the ships of Royal Caribbean.  The art auctions are ***always*** conducted while the ships are cruising in international waters.

27.     Park West has been in business for forty (40) years, and for the last ten (10) years, it has associated with nine (9) cruise lines to provide art auctions as a recreational event for "cruisers," as leisure passengers are frequently called.  The cruise lines Park West operates on are:  Regent Seven Seas, Royal Caribbean, Celebrity, Carnival, Norwegian Cruise Lines, Oceania, Disney and Holland America (the "Cruise Lines").  Park West controls a majority of the shipboard art auction business on Cruise Lines departing from the United States, operating on over eighty (80) ships.  The launch of Park West's ocean-going venture overlaps with the explosion in popularity of leisure cruises as a vacation choice for Americans.  Over seventeen million (17,000,000) passengers cruise annually.

28.     In the ten (10) year time period since Park West began conducting shipboard art auctions, the leisure cruise industry has become the fastest growing segment of the American travel and leisure industry, raking in revenues of thirty billion dollars ($30 billion) in 2008.  The demographics of cruise ship passengers who attend Park West's art auctions consist of well-educated, affluent, middle-to-older aged vacationers with time to spare and money to spend.  The Caribbean is the number one destination from the U.S. for leisure cruises.

29.     By the time Part West launched its shipboard art auction venture, Park West had already established itself as a leader in "popular art" auctions.  Thus, Park West was able to propose to Royal Caribbean that shipboard art auctions were money-making "events," with Park West serving as the concessionaire or vendor.  The shipboard auctions provided a new and significant source of revenue for Park West and Royal Caribbean, but neither Park West nor Royal Caribbean ever disclosed to Plaintiffs and the Class that Royal Caribbean had a financial interest in the auctions.

30.     On its website, Park West states that its mission is to bring the experience of researching, collecting and living with fine art to people who do not have access to outstanding galleries and auction houses.  Park West purposefully pitches its fraudulent and deceptive scheme to the naïve art purchaser at shipboard auctions, selling low value, worthless or fake artwork, while misrepresenting to Plaintiffs and the Class that the artwork is valuable, a "good investment" and that the artwork will "appraise immediately after purchase for many times the sale price."  These uniform misrepresentations were made by Park West to Plaintiffs and the Class on all Royal Caribbean shipboard art auctions during the Class Period.

31.     The artwork Park West sells is not what it represents to its customers.  Park West knew but did not disclose to Plaintiffs and the Class that, to the extent the artwork is "original," it is one of a series so large that it ultimately becomes depressed in value, is one of a series of multiple series, was run after the artist's death, was done by another artist ostensibly with the permission of the featured artist or, worse still, was simply a poster.  The artwork purchased by Plaintiffs and the Class is not a "good investment" because it will not appreciate in value.

11

32.     The only reason that the artwork Park West sells appraises for above the dollar amount paid for it by Plaintiffs and the Class at the shipboard auction is that Park West *itself* does the appraisal, thus guaranteeing that the number will be where Park West wants it to be – above the hammer price.

**Royal Caribbean:**

33.     The Park West proposal was a win-win situation for Royal Caribbean.  The costs associated with the auctions were incurred by Park West, thereby making Royal Caribbean's investment minimal.  Royal Caribbean provided Park West with a venue to display the art and another to conduct the auction.   Royal Caribbean also dedicated a block of time, always when the ship was in international waters, for Park West to conduct the auction.  Royal Caribbean was careful to limit other recreational activities from competing with the same time period of the auction.  Royal Caribbean crews served the provided venues.

34.     For Royal Caribbean, the art auctions, like casino-style gambling, became a major form of entertainment that it provided to cruisers, as well as a major source of revenue.  Royal Caribbean received a guaranteed revenue stream from Park West *via* the auction sales and concessionaire fees; however, neither Park West nor Royal Caribbean ever disclosed to Plaintiffs and the Class that the auctions were a revenue center for Royal Caribbean.

35.     Royal Caribbean's portion of art auction revenue is computed as a percentage of the auction proceeds (up to 20%) against an agreed (but secret) minimum per voyage.  Plaintiffs and the Class spent millions of dollars on purchases of artwork from Park West shipboard auctions on Royal Caribbean Cruises.

12

36.     The artwork that Park West will auction on any particular cruise is handsomely framed and remains on display throughout duration of the cruise.   Royal Caribbean never discloses its financial interest in the art auctions.   Royal Caribbean does not stand behind its concessionaires or offer any relief to Plaintiffs and the Class who complain about Park West, but it continues to allow Park West to conduct its auctions on Royal Caribbean cruises.

37.     Royal Caribbean selects the location and timing of the auction and encourages passengers to attend and mingle at the venue before the auction in the party-like shipboard atmosphere.  Passengers are treated to a free champagne cocktail-hour before the bidding begins, providing time to relax, socialize and preview the artwork that will be offered for sale.   The champagne is provided by Royal Caribbean at Park West's expense and is served by members of the Royal Caribbean crew.

38.     Shipboard art auctions are enormously successful for Park West and Royal Caribbean, earning significant revenue for both.  The financial success of the shipboard auctions depends on the trust placed in Royal Caribbean by Plaintiffs and the Class.  Park West trades on cruisers' trust and faith in Royal Caribbean to sell the artwork at sea and makes the same misrepresentations to auction attendees on cruise after cruise.   Repeat business by cruisers is critical to the success of all cruise lines.  In 2008, one-half (1/2) of all passengers on cruise ships were repeat cruisers.  Repeat Royal Caribbean cruisers would be familiar with Park West, having seen them while on board a previous cruise.

39.     With Royal Caribbean's knowledge, cooperation and agreement, Park West used the reputation of Royal Caribbean to lure Plaintiffs and the Class to the auctions and to close sales.  Plaintiffs and the Class were unaware of the implications of Royal Caribbean's foreign

13

registry and that it was not an American entity, even if departing from the United States. Passengers were generally unaware that, in the event of a dispute, Royal Caribbean and Park West would claim to be insulated by international or admiralty law from consumer claims.

40.     Royal Caribbean facilitated Park West's fraud by allowing Park West, an American entity, to piggy-back on Royal Caribbean's legal insulation under admiralty law by deliberately scheduling the Park West art auctions only when the ship was in international waters and by never disclosing its financial interest in the auctions.  Royal Caribbean "closes down" Park West's auctions while the ship is in port or in the territorial waters of any port of call, creating the illusion for Plaintiffs and the Class that there is a legal impediment to Park West's operating in port, similar to the legal impediments for operating casino gambling while in port.

41.     Royal Caribbean allows cruisers to pay for their Park West purchases and the Park West phony Appraisals on the ship's bill that Royal Caribbean renders to passengers immediately prior to disembarking.

42.     Royal Caribbean never disclosed to Plaintiffs and the Class that it receives a percentage of the auction sale proceeds or that its profitability depends on the success of shipboard venders, including Park West.

43.     Royal Caribbean actively assisted and conspired with Park West and Scaglione in the fraud.  The pattern described in the Complaint is without substantial variation for all Royal Caribbean cruises:  prominent display of auction venue on board the ship, champagne preview, auctions scheduled only in international waters, sales made by means of fraudulent misrepresentations that the art is a "good investment" and will "immediately appraise" for more than the price paid, and payment permitted on the ship's bill.

44.     Sponsorship by Royal Caribbean provides Park West with respectability and access to a large, affluent captive audience.

45.     Over half of the 200,000 American passengers who cruised annually during the Class Period (defined below) reside in Florida, California, Texas, New York, Pennsylvania and Massachusetts.

**The Shipboard Auctions:**

46.     The Park West shipboard auctions are carefully orchestrated by Defendants to generate maximum interest among the passengers.  The auctions are conducted by auctioneers who are either employed (directly or indirectly) by Park West or Scaglione or are under Park West's control.  The "private sales" described herein are part of Park West's shipboard auction scheme and Defendants' conspiracy.

47.     Prior to the opening auction on any Royal Caribbean cruise, the artwork to be auctioned is displayed by Park West at a prominent shipboard location, including such "works" as Dali, Picasso and Rembrandt to serve as a draw.  The start of the auction is prominently featured on the Royal Caribbean ship's daily calendar, on-board website and is announced over the loud speaker system immediately before beginning.

48.     The auctioneers and other Park West employees (together "auctioneer(s)") circulate among the passengers who come to preview the artwork in order to encourage participation in the bidding and to misrepresent to Plaintiffs and the Class, in a uniform sales pitch used at all Park West shipboard auctions on Royal Caribbean, that:  (1) the auctioneers have expertise in art, which they do not; (2) the artwork to be offered at auction is a "good investments," which it is not; (3) the artwork is "original," which it is not, (4) the artwork

actually received will be a "unique variation" (not a copy) of artwork displayed, a meaningless term, and (5) any artwork purchased at auction "will appraise immediately on shore for many times the auction purchase price," which is blatantly untrue.

49.     Employees of Royal Caribbean circulate during the preview, serving champagne and tidying up the venue post-cocktail hour.  Also during the preview, the auctioneers promise a surprise giveaway at the first auction as yet another hook to attract bidders to the auction, all occurring within earshot of the Royal Caribbean crew.

50.     When bidding begins, it is conducted under the direction of auctioneers who are trained by Park West.  Park West employs a "Principal Auctioneer" in Michigan who instructs and trains auctioneers.  The sales pitch employed by the auctioneers touts the investment value of the artwork and includes a sales patter fixing the value of each piece at a dollar amount developed by Park West prior to the auction. This value is then used by Park West as the Appraisal value, which is supplied to the customer after the sale.

51.     At each auction, the auctioneers represent the artwork to be a "good investment" and state that any purchase "will immediately appraise for many times" the purchase price.

52.     At the first auction on each voyage, auctioneers pretend to "sacrifice" an "important" artwork for a seemingly ridiculously low price, sometimes as low as fifty dollars ($50.00), in order to stimulate bidding.  Bidding is fast paced and reflects the general party atmosphere on a Royal Caribbean ship, where passenger spending is not only encouraged but crucial to the financial success of Royal Caribbean.  The auctioneers engage in high pressure tactics, belittling bidders who hesitate to bid higher and always speaking with the pistol shot speed that is the auctioneer's stock in trade.

16

53.     Plaintiffs and the Class are not told by Park West before or during the auction whether a sellers' reserve will be applied, or whether shilling (bidders who are put-ups by Park West and have no intention to purchase) or phantom bidding (bids called with no bidder) are permitted at the auction.  While some of these practices are legal under the laws of some states or may be otherwise regulated by state law, Park West times its auctions to operate out of the reach of state laws regulating auctions.  All Park West ever discloses to Plaintiffs and the Class is the minimum bid.

54.     Auctioneers encourage cruisers to purchase at the auctions (and the previews and the "private sales") by emphasizing that the auction is taking place on board a famous, well-respected cruise line, Royal Caribbean, by stating, "Do you think Royal Caribbean would allow us to have a shop here if we were fraudulent? If we were not reputable?"  At least half of the passengers will recognize Park West's auctions from other cruises, reinforcing Park West's credibility.  Park West omits to disclose Royal Caribbean's financial interest in the auction proceeds.  All of these misrepresentations are made at all auctions and are made openly and are well-known to Royal Caribbean, whose officers and employees can hear them being made and have heard them before.  The auctions are conducted in a public space on the Royal Caribbean ship where Royal Caribbean employees have full and easy access to the proceedings.

55.     Different works or "lots" of artwork are made available for sale by Park West each day at the auction as the cruise progresses.  This procedure assures that Park West has new works to auction each night, replenishing the supply of artwork and encouraging repeat business from passengers who might otherwise not attend more than one auction per cruise.

56.     Successful bidders pay a "hammer price" (highest bid) **plus** a buyer's premium.

17

57.     At the auctions, as bidding is closing down (because Royal Caribbean has a competing recreational activity scheduled or another activity booked for the venue), the auctioneer encourages the cruisers at the auctions to attend a "private sale" where the unsold paintings will be displayed and are available for purchase.  As part of the fraudulent scheme, the auctioneers tell Plaintiffs and the Class that the artwork available at the private sale is an even better value than the artwork being auctioned because there are no other bidders at the private sale to drive up the price.  Purchasers at the private sale still pay the buyer's premium as if the artwork had been purchased at the auction.

58.     The Park West practices described above were followed on every Royal Caribbean cruise where Park West conducted an auction.

**Park West Contracts for Sale:**

59.     Until September 2008, Park West had a strict **NO REFUND** policy.  But the existence of this policy was never disclosed to Plaintiffs and the Class until *after* purchase when Plaintiffs and the Class were able to see the "all sales are final" language on the invoice that Park West gave as proof of purchase to all successful bidders.

60.     A materially identical invoice was given to Plaintiffs and the Class by Park West for each shipboard art purchase.  The invoice is a two sided pre-printed form document generated by Park West.  It affords no opportunity for the Plaintiffs and the Class to negotiate or change any of its terms.  *See* Exhibit A for sample invoice.

(a)     The front of the invoice records the purchaser's name and address with a list and description of the items purchased.  At the bottom of the first page is a pre-printed paragraph (the language of which has not changed substantially over the 10-year period of the

18

scheme's operation) acknowledging purchase and receipt of the invoice and "agreeing" that no verbal agreements or representations remain in effect except as written on the invoice.

        (b)    The back of the invoice records "additional terms and conditions," including:

- "All sales are final…"

- "Appraisals represent our opinion of the price a client would have to pay to replace the work through *a reputable retail art gallery*. We do not rely on third party auction prices or internet prices to arrive at the appraised value. We do not issue refunds if another appraiser has a different opinion than ours."

*See* Exhibit A (emphasis supplied).

61.    Plaintiffs and members of the Class pay for the art purchased by check or credit card while on board the ship. Passengers carrying "insufficient funds" with them to pay for costly artwork can immediately apply for a Park West Gallery credit card called a "Park West Collectors Card." Application and approval for the Park West Collectors Card are accomplished for the purchaser while on board the ship through the use of the telephone or wires.

62.    Another method of payment commonly used by Park West, with Royal Caribbean's knowledge and agreement, is to add the purchase price for the artwork directly to the ship's bill that is presented to Plaintiffs and the Class members before disembarking. These bills too were paid by Plaintiffs and the Class using credit cards that transfer funds electronically. Ship bill costs are placed on the credit card accounts of Plaintiffs and the Class, which are in turn paid by Plaintiffs and the Class through the mail or by wire transfer.

63.    Park West now offers a limited refund or return policy which requires that the buyer forfeit the buyer's premium and pay all costs of returning the artwork. The exchange

privilege is only for selected artwork *chosen by Park West*, and the buyer must sign a confidentiality agreement and release with Park West *and the cruise line* before getting a refund or exchange.

64.     The artwork sold by Park West (that cannot be carried off the boat) is delivered to the buyer at his/her home address six (6) weeks after purchase *via* Federal Express.

65.     A Certificate of Authenticity is placed inside the box at delivery.  The promise of the Certificate of Authenticity is touted at the auctions and is another hook for Park West.

66.     The Appraisals for the artwork purchased on Royal Caribbean cruises are delivered to Plaintiffs and the Class *via* the U. S. Mails.

**Park West's Appraisals (the "Appraisals"):**

67.     Park West offers successful bidders the opportunity to purchase an Appraisal for an additional fee of thirty-five dollars ($35) for the first Appraisal and fifteen dollars ($15) for each additional Appraisal.  Sometimes the Appraisal is automatically tacked on the purchase price for the artwork.

68.     The Appraisals are mailed separately from the artwork *via* U.S. Mail to Plaintiffs and the Class after or about the time the artwork is delivered.

69.     Scaglione signs the Appraisals.  In those instances where Scaglione did not sign the Appraisal, the Appraisal was signed at Park West's and Scaglione's direction.

70.     The appraised value in the Appraisal is *always* greater than the purchase price.

71.     The Appraisals are fraudulent and deceptive with the purpose and intent to mislead Plaintiffs and the Class about the meaning and content of the Appraisal and the value of the artwork purchased.  The Appraisals also serve to lull Plaintiffs and the Class into a false

belief concerning the value of their shipboard art purchases.  The Appraisal's function is to validate the purchase price paid by Plaintiffs and the Class and to conceal Park West's misrepresentations by falsely appraising the artwork for many times the purchase price. Plaintiffs and the Class relied on the representations concerning the Appraisals they received as proof that the purchase made was a "good investment."

72.     Park West used the same or substantially identical Appraisal form for each Class member's purchase.  The Appraisal is a form letter that states:

> "The following work of art has been *examined* by Park West Gallery.  In *our* opinion the current *gallery retail replacement price* for this work, including its frame is [$$$]…"

*See* Exhibit B.

73.     Park West never disclosed to Plaintiffs and the Class that the Appraisal would be performed by Park West, alone, and entirely without objectivity or generally accepted methodology.  The language of the invoice referring to the Appraisal deliberately misstates and implies that Park West or its designate will employ an objective methodology to arrive at its valuation for the Appraisal.

74.     There is no statement from Park West that the Appraisal is being prepared for any specific limited purpose other than what is represented at the auction, which is to provide an objective valuation of the artwork purchased by Plaintiffs and the Class.

75.     The Park West Appraisal is not an independent, objective valuation of the artwork, but rather a phony, self-interested, fraudulent and biased misrepresentation designed to forestall lawsuits and to deceive Plaintiffs and the Class into believing that the **purchase price** paid for the artwork is a "good investment." Park West employs no generally accepted

21

methodology to appraise the artwork other than Park West's "because I say so" or *ipse dixit* valuation of the artwork.

76.     According to the American Society of Appraisers ("A.S.A."), when an appraiser has an interest in the property appraised (as Park West does here as the seller), it is unethical for an appraiser to accept an assignment to appraise a property (here, appraise the value of the artwork) *unless* there is full disclosure to the client.  Park West does not make full disclosure.

77.     Park West misrepresented to Plaintiffs and the Class the methodology employed by Park West for the Appraisal and the value of the artwork purchased. Park West misrepresented to Plaintiffs and the Class that the Appraisal is the result of its research of a price that would be paid by "a reputable retail art gallery," omitting to state that the "reputable retail art gallery" was Park West and that Park West is the only art gallery consulted on the Appraisal value. Park West has admitted in other legal proceeding filings that it has no appraisal methodology other than the methodology described herein.[2]

78.     By stating or implying that Park West accessed information from objective, non-related parties and reputable art galleries to arrive at the valuation of the artwork in the Appraisal and by omitting to disclose that the only valuation the Appraisal would supply would be Park West's own interested opinion, Park West intentionally deceived Plaintiffs and the Class.

79.     Plaintiffs and the Class did not learn of or know about the deficiencies in the Appraisal at the time of purchase.

---

[2]     *See* Plaintiff David Bouverat's Memorandum in Opposition to Defendant Park West's Motion for Summary Judgment, *Bouverat v. Park West Gallery, Inc.*, Case No. 08-31331 (S.D. Fla. March 27, 2009).

**The Fraudulent Scheme**:

80.     The artwork auctioned off by Park West on its Royal Caribbean shipboard auctions were not what Park West represented them to be.  Namely, the artwork was not valuable, not a good investment, not museum quality, not original and oftentimes fake.  Park West deliberately and fraudulently misrepresented to Plaintiffs and the Class, in its uniform sales pitch used on all Royal Caribbean cruises within the hearing and knowledge of Royal Caribbean personnel, that the artwork sold at shipboard auctions was a "good investment," something to "leave to the grandkids" and would, once on shore, "immediately appraise for many times more" than what Plaintiffs and the Class had paid for the artwork because the artwork was "original" and "touched by the artist's hand."

81.     Park West knew, but never disclosed to Plaintiffs and the Class at the shipboard auctions, that:

(a)     Dali forgeries abound in the Park West shipboard auctions (and other galleries).  Dali is a prominent "hook" artist for Park West.

(b)     The Rembrandts offered for sale, Rembrandt Wood Cuts, sold sometimes for as much as $10,000 each, are in fact modern prints (perhaps made from the original woodcut) that are neither rare nor valuable.  Thousands of these "original" Rembrandts are available, and the prints have little chance of appreciation in value and are not a "good investment."  Park West never discloses that the Rembrandt prints were not made during the artist's lifetime.

(c)     Some Park West artwork for sale (all artwork is framed when displayed shipboard) is merely an ink-jet print, little better than a poster.

(d)     The signed and numbered artwork from a series that Park West sells is from a very large series or from one of several series and have little, if any, appreciation value, although Park West represents them to be a "good investment."  Park West only discloses the number in the series when the number is low, but not how many iterations were in the series or if there is more than one series on the market.

(e)     Park West does not disclose when Park West is the only dealer for a particular artist or the work that is offered for sale.

(f)     Park West artists often negotiate bulk sales of their work with Park West, diminishing the value and making Park West the sole or primary dealer for that artist or particular work.

(g)     Artwork sold as "signed by the artist" may have suspect signatures or reproduced pencil signatures.

(h)     Artists' "proofs" of limited editions are editions in addition to the limited edition of the work or that more than one "limited edition" of the same work has been produced.

(i)     Park West always describes the pieces it offers for sale at shipboard auctions as "artwork" or "paintings," even when the work is a print.

82.     Reputable art galleries disclose the date of a work that is one in a series for which multiple series may exist, as well as the number in the series and the number of series in existence.  Reputable galleries also disclose the methodology for the preparation of a print or lithograph offered for sale and whether the print was created by the artist or by another person at the artist's direction, as well as the date of the print preparation and total number in circulation. Reputable galleries always disclose the provenance of "original" works of art.  Park West never

disclosed to Plaintiffs and the Class the details and provenance (as described in this paragraph) for the artwork sold at its shipboard auctions and, in fact, sold the artwork with deliberate misrepresentations.

83.    Plaintiffs and the Class are not sophisticated purchasers of art.  Plaintiffs and the Class relied on the representations of Park West and the reputation and sponsorship of Royal Caribbean in making their purchases.

84.    Royal Caribbean knew, or was reckless in not knowing, that its participation was essential to operation of the Art Auction Enterprise and Park West's scheme.  Upon information and belief, Royal Caribbean has received complaints from dissatisfied Park West customers throughout the Class Period.

85.    At every shipboard auction on every Royal Caribbean cruise, Park West sells or offers to sell an Appraisal for each piece of artwork purchased at the auction.  The Appraisals are worthless, deceptively designed to reinforce Park West's deceit and the inflated value of the purchase made by Plaintiffs and the Class and to conceal the Defendants' illegal scheme.

86.    Royal Caribbean knowingly permits Park West to collect its ill-gotten gains by placing the charges for artwork and Appraisals on the ship's bill.

87.    On September 1, 2008, Park West launched its "40-40 program."  The program promises that all purchasers may return artwork purchased from Park West for a full refund or exchange within forty (40) days of receipt for the full purchase price, less the buyer's premium (up to $1000) plus shipping and handling.  For forty (40) months after the date of the invoice, purchasers can exchange their purchase for another work of art from Park West of equal or greater value, but the work is selected by Park West.

88.     When Park West settles claims with disgruntled customers, the settlements are always subject to a mutual confidentiality agreement, mutual releases and release of the Cruise Lines, including Royal Caribbean.

**Park West's Legal Maneuvering**:

89.     Park West, with the facilitation and cooperation of Royal Caribbean, hides in international waters.  Royal Caribbean carefully schedules the auctions to *never* take place while docked in any port and *never* within the territorial waters of any port-of-call.  Royal Caribbean schedules the art auctions in the late afternoon (around cocktail hour and, in fact, serves the cocktails) and ***always*** after the ship has left port and is cruising international waters.

90.     Conducting business in international waters is important to Park West's deceptive scheme because it provides a legal cloak in Park West's ongoing attempt to limit the legal protection of the states' consumer protection laws to Plaintiffs and the Class, even if the ship departs from the United States.  Park West also argues in legal actions to limit the reach of federal laws to its activities.

91.     Business conducted on the "high seas" that "bears a significant relationship to maritime activity"[3] is governed by admiralty law.  18 U.S.C. § 1333, the "saving to suitors" clause in admiralty jurisdiction law, refers a forum court to the law of the home state of the plaintiff for remedy in the event of litigation.  Royal Caribbean, more often than not, departs from ports that are not in the home state of most, if not all, of its passengers (Plaintiffs' home state is Illinois).  Park West also does not usually have any "presence" in any of the passengers' home states.  As a result, in a lawsuit brought in a Plaintiff's home state, Park West will be able

---

[3]     *See Beegal v. Park West*, 925 A.2d 684, 696 (N.J. Super. Ct. App. Div. 2007).

to argue that each is not amenable to process or that they are not within the personal jurisdiction of the home state court (even under long-arm statutes).

92.     For example, a lawsuit by a California resident alleging violations of the California consumer protection laws by Park West was dismissed for lack of personal jurisdiction over Park West.  At issue in the complaint were Plaintiff's shipboard purchases of artwork at auction and the purchase of phony Appraisals.  Plaintiff sued on behalf of a putative class of California residents, but Park West argued lack of personal jurisdiction, successfully demonstrating to the court that Park West conducted no business in California (even though the Cruise Line did).  *See* Order, *Bautista v. Park West Gallery*, Case No. 2:08-cv-03717-PSG-r2 (C.D. Cal. Sept. 2, 2008).[4]

93.     Exterritorial application of the consumer protection laws of the Plaintiffs' home states provides still another legal hurdle for disgruntled purchasers. A lawsuit by a Florida resident filed in Florida (where Park West can be found), alleging consumer fraud on behalf of a class of Florida purchasers in violation of the Florida consumer protection laws, is still pending. Park West has moved for summary judgment arguing: (1) that Florida law cannot apply to art purchases made by Plaintiffs in international waters, here the Baltic Sea, (2) Florida law cannot have exterritorial application, and (3) that admiralty law preempts Florida consumer law.  *See* Def. Park West's Motion for Summary Judgment, *Bouverat v. Park West Gallery, Inc.,* Case No. 08-31331 (S.D. Fla. Oct. 29, 2008).

---

[4]     A subsequent refiling of this complaint was dismissed on the grounds of collateral estoppel.  Order, *Bautista v. Park West Gallery,* Case No. CV08-6262-PSG (RZx) (C.D. Cal. Dec. 11, 2008).

94.     In another lawsuit pending in Michigan state court, Park West took a different and more aggressive approach.  In *Best v. Park West Galleries, Inc.*, Case No. 0896952-C2 (State of Michigan, Circuit Court for the County of Oakland, filed Dec. 23, 2008), Plaintiffs are seven individuals, one of whom is a Michigan resident. Plaintiffs, who did not file a class action, alleged violations of the Michigan Warranty in Fine Arts Act for Park West's fraud related to the sale of artwork. Park West fired back with a counterclaim for damages against Plaintiffs, alleging defamation, tortious interference with business relationships and civil conspiracy.

95.     In yet another lawsuit, *Blackman v. Park West Galleries Inc.,* Case No. 2:08-1310 (W.D. Wash. Sept. 2, 2008), Park West has also argued that federal law cannot apply to its auctions in international waters.

96.     Park West's goal in conducting its auctions only in international waters is to escape the reach of the state courts and avoid the application of state consumer protection laws to its illegal activities.  Thus far, with the facilitation of Royal Caribbean, Park West has been successful.

## PLAINTIFFS' TRANSACTIONS WITH DEFENDANTS

**Plaintiffs' Purchases at Park West Shipboard Auctions on Royal Caribbean:**

97.     Plaintiffs incorporate and reallege all preceding paragraphs as if fully set forth herein.

a.      Plaintiffs Bruce and Patricia Alleman are not sophisticated purchasers of art.  The Allemans' transactions with Park West and the John Does are typical of Park West's transactions with the Class.

28

b.      Plaintiffs purchased two pieces of art while cruising on the Royal Caribbean ship, *The Enchantment of the Seas,* for a Caribbean vacation in December 2005.

c.      B. Alleman purchased the tickets for the cruise through the internet site, *Expedia.com*, using a MasterCard to pay Expedia.com and by paying MasterCard through an electronic funds transfer.

d.      The Allemans attended three shipboard art auctions while cruising on *The Enchantment of the Seas.*  At each auction, Park West attempted to loosen up passengers by serving champagne, which the Allemans declined.

e.      Plaintiffs bid on and purchased the following pieces of art:

| Ken Shotwell | "London Fog" | 2005, seriolithograph in color on paper signed and numbered in pencil |
|---|---|---|
| Ken Shotwell | "Eiffel Way" | 2004, seriolithograph in color on paper signed and numbered in pencil |

These purchases were made while the Royal Caribbean ship cruised in international waters.

f.      The auctioneer represented to the Allemans that the painting was a "good investment" and that it would appraise for "many times" the price paid at the auction.

g.      The lithographs purchased by Plaintiffs are not a good investment and have little (if any) likelihood of appreciating in value.

29

h.      Plaintiff purchased an Appraisal from Park West in which the artwork "appraised" for a price over the hammer price but only because Park West did the appraisal.

i.      Plaintiffs paid for each of their purchases with a Park West Gallery Collectors Card that B. Alleman applied for while on board *The Enchantment of the Seas*. The purchase price for both pieces totaled approximately $500.   Plaintiffs paid the hammer price plus a buyer's premium, as well as costs for shipping and handling.

j.      The Allemans received an invoice (now lost or destroyed) at the auction that was identical in all material respects to the invoices described in this Complaint.

k.      Plaintiffs also purchased Appraisals for the works purchased.  The Certificates of Authenticity for the artwork and the Appraisals were sent to the Allemans at their residence in Illinois *via* U.S. Mail.  The Appraisal was deceptive and designed to validate the auctioneers' misrepresentations at the auctions – that the artwork was a good investment – by "appraising" the works for amounts in excess of the purchase price.  The Appraisals were in all material respects identical to the Appraisals described above in this Complaint.

98.      Each Appraisal Plaintiffs purchased states on its face, "The current Park West Gallery retail replacement price for this work is: [$$$]...." On the reverse side of each, the "Terms of Appraisal" states:

Method of Appraisal

The appraisal represents our opinion of the price a willing buyer would pay a willing seller to acquire the artwork, with neither being under a compulsion to sell or buy. In making this determination we rely on gallery prices of reputable art galleries and other reliable price data and lists. We do not rely on third party auction prices or internet prices to arrive at appraised value.

a.     The Allemans received an Appraisal from Park West for their purchase of Ken Chatwell's "London Fog," valuing the piece at $360.00. *See* Exhibit C.

b.     The Allemans received an Appraisal from Park West for their purchase of Ken Chatwell's "Eiffel Way," valuing the piece at $460.00. *See* Exhibit D.

98.     Park West's and Royal Caribbean's financial success depends on the trust and faith placed in Royal Caribbean by Plaintiffs and the Class.

99.     But for Park West's misrepresentations and Royal Caribbean's complicity and facilitation, Plaintiffs would not have bid on or purchased the artwork.

**Plaintiffs' Discovery of the Fraud:**

100.     Plaintiffs continued to believe in the validity of the Appraisals and that the value of their Park West purchases were as appraised by Park West until 2008.

101.     On July 16, 2008, an article appeared in the *New York Times* entitled "Art Auctions on Cruise Ships Lead to Anger Accusations and Lawsuits," by Jori Finkel.  The article detailed sales of low value or worthless "artwork" by Park West at shipboard auctions conducted in international waters, employing representations that the artwork offered by Park West was "museum quality" or "good investments."   The article further detailed the difficulty purchasers encountered in obtaining any satisfaction from Park West on their complaints.  The article stated that whenever there was a settlement with a disgruntled customer, Park West required confidentiality.

102.     Shortly thereafter, Plaintiffs conducted some independent research on the internet and came to the conclusion that they had been defrauded and contacted counsel.

## FRAUDULENT CONCEALMENT

103.     The truth of Park West's deceptive operations and the fraud alleged in this Complaint was wrongfully concealed by Defendants from Plaintiffs and the Class.

104.     Park West had a duty to disclose the true value and provenance of the artwork sold at shipboard auctions and to furnish non-deceptive Appraisals when selling appraisals. Notwithstanding this duty, Park West never disclosed the provenance of the artwork, that the artwork was not a good investment and that the Appraisals were phony, self-serving biased statements, utterly worthless for valuing the artwork.  Park West and Royal Caribbean never disclosed their revenue sharing arrangement.

105.     As demonstrated by the allegations in the Complaint, Park West employed and continues to employ the same fraudulent practices to sell artwork at shipboard auctions.  Royal Caribbean continues to offer Park West auctions as recreation for cruisers and to schedule Park West auctions on its cruises while the ship is in international waters.

106.     Park West employs tactics of intimidation and secrecy to avoid detection, which is evidenced by its litigation maneuvers, such as counterclaiming against Plaintiffs.  These strategies are used by Park West to fraudulently conceal its illegal conduct, and all settlements with complaining customers are subject to strict confidentiality agreements and waivers.

107.     Through the current public statements made by Park West on its website, Park West continues to deceive, trumpeting that it has never sold phony artwork. Royal Caribbean

continues to conspire with Park West by scheduling shipboard auctions on cruises in international waters where Park West continues to misrepresent the value of the artwork.

108.   Park West and Royal Caribbean successfully concealed from Plaintiffs and the Class facts that would be sufficient to excite suspicion regarding the claims against them due to Park West's deception, conspiracy and continued operations.

109.   The information that Plaintiffs and the Class required to discover their claims and to prosecute this Complaint is under Defendants' exclusive control.  Park West is not a publicly held corporation and Royal Caribbean is not a domestic corporation, limiting the information available to Plaintiffs and the Class.

110.   Plaintiffs and the Class could not have acquired knowledge sufficient to initiate this action through their exercise of reasonable diligence.  Defendants are estopped from asserting any statute of limitations as a defense to the claims in this Complaint by virtue of Defendants' acts of fraudulent concealment.

111.   Plaintiffs and the Class were not effectively alerted to the existence and scope of this fraud and were not on notice of their potential claims until shortly prior to the filing of this Complaint.

112.   The applicable statutes of limitations for Plaintiffs' and the Class's claims against Park West and Royal Caribbean are tolled by Defendants' fraudulent concealment of their actions as alleged in this Complaint.

**ENTERPRISE**

**The Park West-Royal Caribbean "Art Auction Enterprise":**

113.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

114.    The Park West-Royal Caribbean Art Auction Enterprise (the "Art Auction Enterprise" or "Enterprise") is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of Park West, Scaglione and Royal Caribbean as the Enterprise's members.  The Art Auction Enterprise is an organization, functioning as an ongoing and continuing unit that was created or used as a tool by Park West with the facilitation of Royal Caribbean in order to effectuate through the pattern of racketeering activity as alleged in this Complaint and achieve the common goals of financial remuneration.

115.    PWG, PWG FL, Vista, FASI, Scaglione and Royal Caribbean are each a "person" distinct from the Royal Caribbean Enterprise.

116.    Defendants' racketeering activities as described in this Complaint amounted to a common course of conduct, which the Art Auction Enterprise intended to deceive and harm Plaintiffs and the Class Members.  Each racketeering activity alleged was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the Class.  Park West's racketeering activities were part of its ongoing business and constitute a continuing threat to the property of Plaintiffs and the Class.

117.    Park West and Scaglione designed the Art Auction Enterprise to accomplish the common goals shared by each of its members as detailed above in this Complaint.  Royal

34

Caribbean conspired with Park West and Scaglione to accomplish the goals of the Art Auction Enterprise.

118.    The Art Auction Enterprise functions as a continuing unit with each member of the Enterprise knowing its (or their) role and performing its part or role to assure the Enterprise's continued success.   Members of the Art Auction Enterprise participated together in the fraudulent scheme as described above in this Complaint.

119.    The Art Auction Enterprise has been in existence for ten (10) years and continues in existence to the present.

## CLASS ACTION ALLEGATIONS

120.    Plaintiffs bring this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of:

> All persons residing in the United States or Puerto Rico, who purchased artwork and Appraisals at shipboard auctions conducted by Park West Gallery, Inc., PWG Florida, Inc., Vista Fine Art LLC d/b/a Park West at Sea, Fine Art Sales, Inc. or John Does 1-100 (together "Park West") on a ship owned or operated by Royal Caribbean Cruises Ltd. (the "Class") during the applicable statute of limitations period (the "Class Period").   Excluded from the Class are Park West, Royal Caribbean and Park West's or Royal Caribbean's affiliates and each of their officers, directors or employees.

121.    The Class is sufficiently numerous to satisfy numerosity, with thousands of Class members having purchased artwork from Park West at shipboard auctions while on a Royal Caribbean cruise.   The Class members are dispersed throughout the United States such that joinder of all members of the Class is impracticable.   The Class members can be identified by records maintained by Defendants Park West and Royal Caribbean.   Park West's Director of Shipboard Operations from its Southfield, Michigan headquarters has declared under penalty of

perjury in the *Bouverat* litigation (cited above) that Park West prepares an "End of Cruise Report" for each cruise on which it conducts auctions, which records the trip history for each art auction held on board any Royal Caribbean cruise, as well as sales to Class Members during the cruise.

122.   Park West also maintains copies of all invoices and Appraisals for purchases at shipboard auctions that will identify members of the Class.

123.   Royal Caribbean maintains ship manifests of all passengers that would identify members of the Class.

124.   Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class members are:

a.   whether Park West fraudulently misrepresented the value of the artwork it sold to Plaintiffs and the Class at shipboard auctions on Royal Caribbean cruises as a "good investment";

b.   whether Park West fraudulently misrepresented the Appraisals sold to Plaintiffs and the Class at shipboard auctions on Royal Caribbean cruises;

c.   whether Park West concealed or omitted material information from Plaintiffs and the Class regarding the artwork sold to Plaintiffs and the Class or Appraisals sold at shipboard auctions on Royal Caribbean cruises;

d.   whether Park West engaged in a systematic, deceptive, uniform and continuing scheme to sell low value or forged artwork as valuable and a "good investment" at shipboard auctions on Royal Caribbean cruises;

36

e.     whether Park West employed a uniform pattern of misrepresentation and omission in the sale of artwork on shipboard auctions on Royal Caribbean cruises;

f.     whether Royal Caribbean voluntarily, knowingly and intentionally conspired with Park West and Scaglione to facilitate Park West's fraud;

g.     whether Royal Caribbean voluntarily, knowingly and intentionally conspired with Park West and Scaglione to violate RICO, 18 U.S.C. § 1962(c);

h.     whether Royal Caribbean participated in the alleged conspiracy with Park West up to and including the present;

i.     whether the acts and omissions of Defendants as described in this Complaint violate RICO;

j.     whether Defendants are liable to Plaintiffs and the Class for damages for conduct actionable under RICO;

k.     whether Defendants are "persons" as defined in RICO, 18 U.S.C. § 1961(3);

l.     whether the Art Auction Enterprise is an association-in-fact enterprise pursuant to RICO, 18 U.S.C. § 1961(4);

m.     whether Park West engaged in a pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5);

n.     whether Park West, Scaglione and Royal Caribbean conspired to engage in the pattern of racketeering activity as defined in RICO, 18 U.S.C. § 1961(5), and alleged above in this Complaint;

o.      whether Defendants used the mails and wires to further their fraudulent scheme and conspiracy as alleged in this Complaint;

p.      whether Defendants and Royal Caribbean engaged in a conspiracy in violation of RICO, 18 U.S.C. § 1962(d);

q.      whether Defendants unjustly enriched themselves at the expense of the Plaintiffs and the Class;

r.      whether the acts and omissions of Park West and Scaglione violated the various state laws as alleged below;

s.      whether Scaglione controls Park West;

t.      whether Scaglione and each of the Park West entities are alter egos;

u.      whether Plaintiffs and the Class were injured and sustained damages and loss as a result of Defendants' illegal acts and omissions as alleged in this Complaint;

v.      the scope, extent and measure of damages and equitable relief that should be awarded to Plaintiffs and the Class;

w.      the amount of attorneys' fees, prejudgment interest, and costs of suit to which Plaintiffs and the Class are entitled; and

x.      whether the Defendants' acts and omissions were sufficiently wrongful to entitle Plaintiffs and Class members to punitive damages.

125.    Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the Class sustained damages arising out of the Defendants' wrongful conduct as detailed in this Complaint.  Specifically, Plaintiffs' claims and the Class' claims arise from Defendants' illegal scheme and pattern of racketeering activity as alleged in this Complaint.

38

126.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action lawsuits.  Plaintiffs have no interests antagonistic to or in conflict with those of the Class and therefore should be adequate as representatives for the Class.

127.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation would make it impossible for such Class members to individually redress the wrongs done to them.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

**COUNT I**

**VIOLATION OF 18 U.S.C. § 1962(c)**

128.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

129.     This Count I is brought against Park West and Scaglione.

130.     PWG, PWG FL, Vista and FASI and Scaglione are each a "person" within the meaning of RICO, 18 U.S.C. § 1961(3), who conducted the affairs of the Art Auction Enterprise through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c), in that Park West and Scaglione intentionally employed a scheme or artifice to defraud Plaintiffs and the Class using the mails or wires in furtherance of that scheme.

131.    The Art Auction Enterprise, in the manner described in this Complaint, engaged in and affected interstate commerce.

132.    Park West or Scaglione exerted sufficient control over the Art Auction Enterprise so that they were able to direct and conduct the affairs of the Enterprise.

133.    Park West and Scaglione conducted and participated in the affairs of the Art Auction Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud) as described in this Complaint.

134.    Park West's and Scaglione's use of the U.S. Mail and wires in furtherance of the fraud described in this Complaint involved thousands of communications, including, but not limited to:

a.    communications between Park West or Scaglione and each of the members of the Art Auction Enterprise to establish and maintain the Enterprise;

b.    communications including financial payments by Park West or Scaglione to Royal Caribbean in furtherance of the activities of the Art Auction Enterprise, planning or discussing or relating to the scheduling and conducting of shipboard auctions on Royal Caribbean cruises;

c.    communications between Park West and Plaintiffs and the Class including mailing Appraisals, receiving payments from Plaintiffs and the Class in the mail or through the wires, establishing credit card accounts *via* the mails and wires encompassing thousands of substantially identical communications in furtherance of the fraud as detailed above in this Complaint;

40

        d.      communications directly or indirectly *via* mail and wire, between Royal Caribbean and Plaintiffs and the Class to reserve passage on Royal Caribbean cruises, to pay for and receive tickets for the cruise and to pay the ship's bill before disembarking from the cruise.

        e.      communications between the Park West entities or Park West and Scaglione in furtherance of the conspiracy alleged in this Complaint;

135.    In addition, Park West and Scaglione have communicated by U.S. Mail, telephone and facsimile or wire with various artists and the artists' sales representatives and others around the country in furtherance of their scheme alleged in this Complaint.

136.    Defendant Park West Gallery maintains a website through which it communicates and continues to communicate with Plaintiffs and members of the Class, also using the website to fraudulently conceal its illegal behavior.  *See* www.parkwestgallery.com.

137.    Plaintiffs and the Class have been injured in their property by reason of the violations alleged in this Complaint in that Plaintiffs and the Class paid millions of dollars in payments for artwork purchased from Park West and Appraisals signed by Scaglione at shipboard auctions on Royal Caribbean ships that they would not have paid had Defendants not engaged in their pattern of racketeering activity.

138.    The injuries to Plaintiff and the Class were directly and proximately caused by Park West and Scaglione's racketeering activity as described above.

139.    By virtue of these violations of 18 U.S.C. § 1962(c), Park West and Scaglione are liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the cost of this suit, including reasonable attorney's fees.

## COUNT II

## VIOLATION OF 18 U.S.C. § 1962(d)

140.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

141.    This Count II is alleged against all Defendants.

142.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

143.    Defendants have violated § 1962(d) by conspiring to violate RICO, 18 U.S.C. § 1962(c), as alleged in this Complaint.  The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of affairs of the Art Auction Enterprise through a pattern of racketeering activity.

144.    Defendants, as co-conspirators, have engaged in numerous overt acts in furtherance of the conspiracy as described in this Complaint, including multiple instances of mail and wire fraud violations, including but not limited to:

a.    knowingly agreeing to and scheduling the shipboard art auctions to take place in international waters;

b.    knowingly agreeing to and establishing a display area for the artwork for sale at a prominent venue of the ship;

c.    knowingly agreeing to schedule Park West to conduct art auctions on Royal Caribbean cruises for over ten (10) years;

d.      Royal Caribbean's communicating by mail and wire with Plaintiffs and the Class to book tickets, establish travel itineraries and collect payments for tickets and for ship's bills; and

e.      collecting shared revenues.

145.    The nature of the above-described co-conspirators' acts in furtherance of the conspiracy gave rise to a plausible inference that each of the Defendants agreed to the objective of violating RICO, 18 U.S.C. § 1962(c), and that by conspiring to violate RICO, 18 U.S.C. § 1962(c), they were aware that their ongoing fraudulent acts were and are part of an overall pattern of racketeering activity.

146.    Plaintiffs and the Class have been injured in their property by reason of the conspiracy alleged herein in that Plaintiffs and the Class have paid Park West millions of dollars for artwork purchased at shipboard auctions on Royal Caribbean ships in the operation of the Art Auction Enterprise that Plaintiffs and the Class would not have paid had Defendants not conspired to violate RICO, 18 U.S.C. § 1962(c).

147.    The injuries of Plaintiffs and the Class were directly and proximately caused by the conspiracy to violate RICO, 18 U.S.C. § 1962(c), as described above.

148.    By virtue of these violations of RICO, 18 U.S.C. §1962(d), Defendants are liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT III

## VIOLATION OF 18 U.S.C. § 1962(a)

149.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

150.    This Count III is alleged against Albert Scaglione.

151.    Park West Galleries, Inc. is a private corporation with Albert Scaglione as its principal shareholder and manager of its day-to-day operations.   Scaglione controls PWG.

152.    Scaglione is the sole member of Vista Art LLC d/b/a Park West at Sea, through which Park West sells artwork on Royal Caribbean cruises.

153.    Scaglione receives income from the pattern of racketeering described in this Complaint.

154.    Scaglione used and invested the income from the pattern of racketeering activity alleged in this Complaint to invest in the operation of the Art Auction Enterprise.

155.    Scaglione invested the income to build, launch and maintain a Salvatore Dali website launched in 2009, in conjunction with Park West's website, to promote Park West's sale of Dali's works at shipboard auctions in and to further the goals of the Art Auction Enterprise.

156.    The Art Auction Enterprise affects interstate commerce.

157.    By virtue of these violations of RICO, 18 U.S.C. § 1962(a), Plaintiffs and the Class were injured in their property by Scaglione's use and investment of racketeering income, and Scaglione is liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus costs of this suit and reasonable attorneys' fees.

## COUNT IV

## VIOLATION OF 18 U.S.C. § 1962(b)

158.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

159.    This Count IV is alleged against Albert Scaglione.

160.    Scaglione is the principal and largest shareholder of PWG and sole member of Vista Art LLC d/b/a Park West at Sea, which sells artwork on Royal Caribbean cruises.

161.    Scaglione receives income from the pattern of racketeering described in this Complaint.

162.    Scaglione used or invested the income from the pattern of racketeering activity to invest in and maintain the Art Auction Enterprise.

163.    Scaglione invested the income to maintain the Art Auction Enterprise and to build, launch and maintain a Salvatore Dali website in 2009 to promote Park West's prominence in the sale of Dali's works at auctions on Royal Caribbean cruises in furtherance of the goals of the Art Auction Enterprise.

164.    The Art Auction Enterprise affects interstate commerce.

165.    By virtue of these violations of RICO, 18 U.S.C. § 1962(b), Plaintiffs and the Class were injured in their property, and Scaglione is liable to Plaintiffs and the Class for three times the damages that Plaintiffs and the Class have sustained, plus costs of this suit and reasonable attorneys' fees.

## COUNT V

## VIOLATIONS OF STATE CONSUMER PROTECTION STATUTES

166.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

167.    This Count V is alleged against Park West.

168.    For purposes of this Count V only, the Class is limited to citizens of California, Florida, Illinois, Massachusetts, Michigan, New York and Pennsylvania.

169.    Park West engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the state consumer protection statutes listed below when they employed the deceptive sales tactics described herein.   As a direct result of Park West's deceptive, unfair and unconscionable conduct, Plaintiffs and the Class were injured in that they paid millions of dollars for artwork purchased at shipboard auctions on Royal Caribbean cruise ships that they would not have paid had Defendants not engaged in unfair and deceptive conduct.

170.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*

171.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. Ann. § 501.201, *et seq.*

172.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Fraud and Deceptive Bus. Prac. Act, § 815 ILCS 505/1, *et seq.*

173.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, *et seq.*

174.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of Mich. Comp. Laws § 445.901, *et seq.*

175.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.*

176.    Park West has engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Cons. Stat. § 201-1, *et seq.*

177.    The unfair and deceptive acts and practices of Park West have directly, foreseeably and proximately caused damages and injury to Plaintiffs and the members of the Class.

178.    The actions and failure to act by Park West, including the false and misleading representations and omissions of material facts regarding the value of the artwork and Appraisals purchased at shipboard art auctions on Royal Caribbean cruises and the above described course of deceptive conduct and fraudulent concealment, constitute acts, uses, or employment by Park West of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale of artwork at shipboard auctions on the Royal Caribbean cruises.

179.    Plaintiffs and the Class are not sophisticated purchasers of art and relied upon the Count V Defendants' misrepresentations and omissions in purchasing artwork and Appraisals at shipboard auctions on the Royal Caribbean cruises.  Plaintiffs and the Class relied upon Park West's misrepresentations and omissions in paying for the artwork and Appraisals.  By reason of the unlawful acts engaged in by Park West, Plaintiffs and the Class have suffered ascertainable

loss and damages.  As a direct and proximate result of this wrongful conduct, Plaintiffs and the Class were damaged by paying for the artwork.

180.    As a direct and proximate result of Park West's wrongful conduct, Plaintiffs and members of the Class were injured and are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit.

**COUNT VI**

**VIOLATIONS OF STATE FINE ART STATUTES**

181.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

182.    This Count VI is alleged against Park West and John Does 1-50 (together "Park West").

183.    For the purposes of this Count VI only, the Class is limited to citizens of Michigan, Florida, and New York.

184.    Plaintiffs and the Class bid on and purchased artwork at shipboard art auctions held on Royal Caribbean cruises based on the descriptions and representations made by Park West as to the authorship, authenticity, genuineness and value of the artwork.  Park West made statements with respect to the authorship, authenticity, genuineness and value of the artwork both verbally and in writing, and Plaintiffs received an Invoice, Certificate of Authorization and/or an Appraisal setting forth Park West's representations.

185.    Park West's statements regarding the authorship, authenticity, genuineness and/or value of the artwork purchased by Plaintiffs and the Class created an express warranty as to the accuracy of those statements by virtue of the statutes listed below.  Park West intentionally and

48

deliberately made misleading statements to Plaintiffs and the Class that the artwork they purchased was of a particular authorship, authenticity, genuineness and/or value, when Park West knew or should have known that the descriptions of the artwork provided to Plaintiffs and the Class were not accurate and/or were misleading.

186. Park West made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of Fla. Stat. § 686.501, *et seq.*

187. Park West made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of Mich. Comp. Laws § 442.321, *et seq.*

188. Park West made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of Mich. Comp. Laws § 442.351, *et seq.*

189. Park West made intentionally misleading and/or false statements to Plaintiffs and the Class in their description of the artwork Plaintiffs and the Class purchased in violation of N.Y. C.L.S. Art & Cult. Affr. § 13.01, *et seq.*

190. The authorship, authenticity, genuineness and value of the artwork purchased by Plaintiffs and the Class are characteristics that are essential to the identity of the goods sold.

191. Park West intentionally and in bad faith misrepresented the authorship, authenticity, genuineness and/or value of the artwork purchased by Plaintiffs and the Class.

192. Plaintiffs and the Class are not sophisticated purchasers of art and relied upon Park West's misrepresentations and omissions in purchasing artwork and Appraisals at shipboard

49

auctions on the Royal Caribbean cruises. Plaintiffs and the Class relied upon Park West's misrepresentations and omissions in paying for the artwork and Appraisals.

193.    Park West failed to deliver artwork to Plaintiffs and the Class that conformed to its own description of such goods.

194.    As a direct and proximate result of the foregoing, Plaintiffs and the Class were damaged in an amount to be determined at trial.

<u>**COUNT VII**</u>

<u>**BREACH OF CONTRACT**</u>

195.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set out herein, except Counts V (state consumer protection laws) and VI (state fine art statutes).

196.    Plaintiff brings this Count in the *alternative* to Counts V and VI.

197.    This Count VII is brought against Park West.

198.    The Certificate of Authenticity issued to Plaintiffs and the Class and furnished by Park West with the artwork purchased at shipboard art auctions constitutes a valid and enforceable contract with Park West.  *See* Exhibit E, Sample Certificate of Authenticity.

199.    A material term of the contract between Park West and Plaintiffs and the Class was the guarantee of authenticity of the artwork sold at shipboard auctions on Royal Caribbean cruises.

200.    Plaintiffs and the Class performed all of their duties and responsibilities under the contract.

201.    Notwithstanding the covenants and promises contained in that contract, specifically, the guarantee of authorship described in the Certificate of Authenticity furnished by

50

Park West, Park West failed to deliver the genuine works as described therein to Plaintiffs and the Class.

202.   As a direct and proximate result of the foregoing, Plaintiff and other members of the Class have been injured and damaged in an amount to be determined at trial.

## COUNT VIII

## BREACH OF WARRANTY

203.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set out herein, except Counts V (state consumer protection statute) and VI (state fine art statutes).

204.   This Count VIII is brought against Park West as an *alternative* to Counts V  and VI.

205.   The statements of Park West regarding the authenticity, genuineness and value of the artwork in the Appraisals purchased by Plaintiffs and the Class constitute an express warranty.

206.   The authorship, authenticity, genuineness and value of the artwork purchased by Plaintiffs and the Class are characteristics that are essential to the identity of the goods sold.

207.   Park West failed to deliver artwork to Plaintiffs and the Class that conformed to its own description of such goods.

208.   As a direct and proximate result of the foregoing, Plaintiffs and the Class were damaged in an amount to be determined at trial.

## COUNT IX

## UNJUST ENRICHMENT

209.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, except Counts VII (breach of contract) and VIII (breach of warranty).

210.    This Count IX is brought against all Defendants as an *alternative* to Counts VII and VIII.

211.    As the intended and expected result of Defendants' conscious wrongdoing, set forth in this Complaint, Defendants profited and benefitted from payments Plaintiffs and the Class made to them for artwork and Appraisals purchased at shipboard auctions on Royal Caribbean cruises.

212.    Defendants voluntarily accepted and shared these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid for artwork when they otherwise would not have done so.

213.    An inequity resulted to Plaintiffs and the Class because Defendants kept the benefit and were unjustly enriched.

214.    Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court and such other relief as the Court deems just and proper

## COUNT X

## CIVIL CONSPIRACY

215.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

216.     This Count X is alleged against all Defendants.

217.     Defendants engaged in concerted action to accomplish the fraud described in this Complaint.

218.     Defendants' overt acts, as detailed in the Complaint, result in the plausible inference that Defendants intentionally agreed to defraud Plaintiffs and the Class.

219.     As a direct and proximate result of this wrongful conspiracy, Plaintiffs and the Class suffered ascertainable injury and were damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand judgment against Defendants in each claim for relief, jointly and severally, as follows:

a.     declaring that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, establishing an appropriate class, appointing Plaintiffs as the Class Representative, and appointing the undersigned counsel of record as Class Counsel;

b.     requiring Defendants to refund and make restitution of all monies acquired from the sale of artwork at shipboard auctions on Royal Caribbean to Plaintiffs and the Class;

c.     awarding damages on the RICO claims;

d.     awarding damages from Park West on the claims under the consumer protection statutes of the various states, as enumerated above, respecting the compensatory damages Plaintiffs and the Class have sustained as a result of Park West's conduct, and punitive damages, such amounts to be determined at trial, plus Plaintiffs' costs in this suit, including reasonable attorneys' fees;

e.      awarding damages on the claims for breach of contract and breach of warranty as enumerated above against Park West;

f.      awarding recovery on Plaintiffs' and the Class's claim for unjust enrichment against all Defendants, in the amount of payments for artwork purchased at shipboard auctions on Royal Caribbean cruises in such amount to be determined at trial, plus Plaintiffs' costs in this suit, including all reasonable attorneys' fees;

g.      awarding Plaintiffs and the Class statutory damages as permitted, including any applicable exemplary damages;

h.      awarding Plaintiffs and the Class prejudgment interest;

i.      awarding Plaintiffs and the Class restitution and/or disgorgement and other equitable or injunctive relief as the Court deems appropriate;

j.      awarding Plaintiffs and the Class costs and expenses in this litigation, including, but not limited to, expert fees and reasonable attorneys' fees; and

k.      awarding Plaintiffs and the Class such other and further relief as may be just and proper.

## **<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

/s/ E. Powell Miller_____
E. Powell Miller (P39487)
Marc L. Newman (P51393)
THE MILLER LAW FIRM, P.C.
950 West University Drive
Suite 300
Rochester, Michigan  48307
(248) 841-2200
epm@millerlawfirmpc.com

Steven A. Schwartz (Pa. I.D. 50579)
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, Pennsylvania  19041
(610) 642-8500
steveschwartz@chimicles.com

Of Counsel:

Denise Davis Schwartzman (Pa. I.D. 40659)
Kimberly A. Sanders (PA. I.D. 206431)
Chimicles & Tikellis LLP
361 W. Lancaster Avenue
Haverford, PA  19041
(610) 642-8500

Dated: July 22, 2009